# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DOLE FOOD COMPANY, INC. | ) | CONSOLIDATED |
| STOCKHOLDER LITIGATION | ) | C.A. No. 8703-VCL |

## MEMORANDUM OPINION

Date Submitted: February 2, 2017
Date Decided: February 15, 2017

Stuart M. Grant, Nathan A. Cook, Kimberly A. Evans, Michael T. Manuel, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Randall J. Baron, A. Rick Atwood, Jr., David T. Wissbroecker, Edward M. Gergosian, Maxwell Huffman, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Marc A. Topaz, Lee D. Rudy, Michael C. Wagner, Justin O. Reliford, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Class Counsel.*

J. Clayton Athey, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Counsel for Defendants David H. Murdock and DFC Holdings, LLC.*

Bruce L. Silverstein, Elena C. Norman, James M. Yoch, Jr., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Counsel for Dole Food Company, Inc.*

**LASTER, Vice Chancellor.**

On November 1, 2013, Dole Food Company, Inc. ("Dole" or the "Company") completed a going-private transaction structured as a single-step merger. The merger consideration of $13.50 per share was distributed to Dole's stockholders of record, including Cede & Co., the nominee of the Depository Trust Company ("DTC"). In turn, DTC distributed the merger consideration to its participant members based on the information about their positions that was reflected in DTC's centralized ledger.

The plaintiffs sued Dole's fiduciaries on behalf of a class comprising the holders of shares of Dole common stock who were unaffiliated with the defendants. In December 2015, the parties settled the case for consideration of $2.74 per share plus interest.

The stipulation provided for the settlement proceeds to be distributed to class members through a traditional claims process. There were 36,793,758 shares in the class. At the conclusion of the claims process, however, claimants had submitted facially valid claims for 49,164,415 shares.

Despite diligent efforts, the settlement administrator and class counsel could not resolve the discrepancy. Class counsel moved to modify the allocation procedure to authorize the settlement proceeds to be distributed to class members using the same payment mechanism used to distribute the merger consideration. This decision grants their motion.

1

# I.    FACTUAL BACKGROUND

Pursuant to a Stipulation and Agreement of Settlement dated December 7, 2015, the plaintiffs agreed to settle the claims they were pursuing against the defendants in return for a payment of $2.74 per share plus interest. The stipulation defined the class as follows:

> [A]ll record holders and beneficial owners of common stock of Dole during the period commencing June 11, 2013 and ending November 1, 2013, together with their successors and assigns. Excluded from the Class are Defendants, and each of their affiliates, legal representatives, heirs, successors in interest, transferees and assigns. Also excluded from the Class are [ten petitioners in the related appraisal action (the "Appraisal Petitioners")], except to the extent any such Appraisal Petitioners owned shares of Dole common stock at the Closing that were not the subject of a perfected appraisal demand.

Dkt. 750, ¶ 1(d). The parties stipulated in the pre-trial order that holders of 54,084,157 shares of Dole common stock were unaffiliated with the defendants. Dkt. 648, ¶ 6. For purposes of the class definition, holders of 17,290,399 shares were "Appraisal Petitioners." Dkt. 787 at 1.n.2. The class therefore comprised holders of 36,793,758 shares.

On February 10, 2016, the court approved the settlement. The stipulated form of final order provided that the "Settlement Administrator shall make distributions to Settlement Payment Recipients in the manner and subject to the conditions set forth in the Stipulation." Dkt. 780, ¶ 18.

The defendants paid the settlement amount on March 28, 2016. Including interest, the total payment was $115,793,059.57. Counsel deducted from this amount the awards that the court approved for attorneys' fees and expenses.

A.B. Data served as the Settlement Administrator. Beginning on December 11, 2015, A.B. Data mailed notices and claim forms to potential class members, brokers, and

2

other nominees. In total, A.B. Data mailed 24,322 notice packets. A.B. Data disseminated a summary notice via *PR Newswire* and published the summary notice in the *Investor Business Daily*. The notices instructed class members to submit claims to A.B. Data by April 11, 2016. A.B. Data set up a telephone hotline and a website to assist potential class members.

In total, A.B. Data received 4,662 claims: (i) 874 from paper filers and (ii) 3,788 from e-filers. Paper filers are typically individuals or small holders who submit claims by mailing back the claims forms and providing hard copies of supporting documents. E-filers are typically institutional investors. They may be involved in hundreds or thousands of transactions during the class period, and they submit their claims using a computerized system.

After uploading the paper claims and merging them with the electronic claims to create a single database, A.B. Data reviewed the claims for deficiencies. A.B. Data identified deficiencies for 411 paper claims and 2,547 electronic claims. A.B. Data mailed letters to the paper filers that identified the deficiencies and asked for additional information. A.B. Data mailed letters to the e-filers that instructed them to review an Excel spreadsheet that A.B. Data emailed separately with details about their deficiencies. If a claimant cured a deficiency, then A.B. Data updated its database.

At the conclusion of the claims process, claimants had submitted facially eligible claims for 49,164,415 shares. That figure substantially exceeded the 36,793,758 shares in the class.

A.B. Data and class counsel took a number of steps to investigate the discrepancy. Beginning in September 2016, A.B. Data reviewed the paper and electronic claims a second time to identify ineligible shares. A.B. Data also reviewed again the documentation that claimants had submitted to support their claims. In many instances, claimants had provided month-end account statements that reflected the receipt of the merger consideration. Ordinarily, that would be sufficient to validate the number of shares a claimant held at the effective time and hence the validity of a claim to the settlement consideration for that number of shares.

In addition, A.B. Data requested additional documentation from the largest e-filers, and class counsel obtained a security positions report from DTC, commonly known as a "Cede breakdown." A Cede breakdown reflects the number of shares of an issuer's common stock that DTC participant banks and brokers hold as of a given date as reflected on DTC's centralized ledger. Class counsel obtained a Cede breakdown for DTC that showed the participant holdings in Dole common stock as of close of business on November 1, 2013, when the merger closed.

Using the additional documentation and Cede breakdown, A.B. Data attempted to match the largest claims against corresponding positions on the Cede breakdown. Through this process, A.B. Data reduced the discrepancy by only 48,758 shares.

A.B. Data next sent letters to 127 DTC participants in an effort to verify their share counts. A.B. Data also mailed letters to the 78 largest e-filers requesting further documentation. The response was tepid, with only 18 DTC participants and 17 e-filers

4

deigning to respond. The responses that A.B. Data received did not help materially in reducing the discrepancy.

In an effort to find the root cause, class counsel spoke with a DTC representative about the accuracy of the positions reflected on the Cede breakdown. The representative explained that DTC placed "chills" on its records for its participants' positions in Dole common stock as of the close of business on November 1. A "chill" restricts a participant's ability to deposit or withdraw the security. *See* U.S. Securities & Exchange Commission, Fast Answers: DTC Chills, *available at* http://www.sec.gov/answers/dtc-chills.htm. Once DTC initiated the chills, the participants' positions in Dole common stock were locked in and could not change. At 6:00 p.m. on November 1, DTC generated the Cede breakdown that it later used to distribute the merger consideration. On Monday, November 4, DTC distributed the merger consideration to its participants using the Cede breakdown. DTC later provided class counsel with a copy of the same Cede breakdown.

The discussions with the DTC representative also revealed a problem: DTC's centralized ledger did not reflect all of the trades in Dole common stock on the day of the merger or during the two days preceding it. Under the current standard of T+3 for clearing trades, DTC did not receive information about all of the transactions that took place on October 30, October 31, or November 1. The DTC participants who facilitated transactions that had not yet cleared when the merger closed were responsible for properly allocating the merger consideration among the parties to the transactions.

5

During the three-day period leading up to the closing of the Dole merger, more than 32 million shares of Dole common stock changed hands. The following table reflects the daily volume:

| DATE | VOLUME |
|---|---|
| October 30, 2013 | 1,065,386 shares |
| October 31, 2013 | 13,102,481 shares |
| November 1, 2013 | 18,228,405 shares |

When the merger closed, DTC's centralized ledger did not reflect all of these trades.

For purpose of the settlement, multiple owners could submit claims for shares involved in trades that had not cleared. A DTC participant who continued to hold the shares as reflected on DTC's records could submit a claim, but so could the beneficial owner who was a client of the DTC participant that acquired the shares and therefore owned them as of closing. Both claims could appear facially valid even though they involved the same underlying shares.

In addition, as of October 31, 2013, traders had shorted approximately 2.9 million shares of Dole common stock. Because the price of Dole common stock traded above the merger price through closing, it is likely that traders shorted additional shares on November 1, resulting in even more shares in short positions as of closing.

In a typical short sale, the seller borrows a share from another stockholder and sells it. *See In re Digex, Inc. S'holders Litig.*, 2002 WL 749184, at *2 (Del. Ch. Apr. 16, 2002). The borrower only returns the borrowed share after the short position is closed. *Id.* Under

6

current share-lending practices, brokers and custodial banks have authority to lend shares without the beneficial owner knowing that shares were "borrowed" from its account. The relationships that permit share-lending are documented in a combination of agreements between the account holders and their brokers or custodial banks and in other agreements between institutions who facilitate the short selling.

The shorting resulted in additional beneficial owners who received the merger consideration, who fell within the technical language of the class definition, and who could claim the settlement consideration. Meanwhile, the lenders of the shares, not knowing that the shares were lent, also could claim the settlement consideration. This is another means by which two different claimants could submit facially valid claims for the same underlying shares.

Without obtaining detailed records about the millions of trades that took place during the three days leading up to the closing, it is impossible to determine who owned the shares as of closing. And obtaining those records is not realistically achievable. The data in DTC's centralized ledger does not reflect all of the trades executed during the three days before closing, and it only would show changes in the total number of shares held by its participants. To get at the underlying trades, A.B. Data would need records from over 800 DTC participant brokers and custodial banks. A.B. Data also potentially would need records from the individual clients of those brokers and custodial banks. A.B. Data already has asked the participants and e-filers to provide additional records. Many failed to respond, and the court has no readily available means to compel cooperation.

Consequently, any effort to obtain the records necessary to conduct the analysis promises to be an expensive and time-consuming exercise in futility.

But obtaining the records would be only the first hurdle. If cleared, determining the actual ownership of the shares comprising the class still would require a forensic audit of herculean proportions. The audit likely also would uncover additional disputes about who held the property right to claim the settlement consideration, particularly in situations involving borrowed shares. A.B. Data initially and the court subsequently would need to make determinations about who should receive the settlement consideration under the contractual agreements governing the relationships among beneficial owners. The journey down the rabbit hole would require mapping the entire warren.

It is therefore functionally impossible to resolve the share discrepancy in a practical or cost-effective manner. The resulting process would be lengthy, arduous, cumbersome, expensive, and fundamentally uncertain.[1]

---

[1] This problem is an unintended consequence of the top-down federal solution to the paperwork crisis that threatened Wall Street in the 1970s. Through the policy of share immobilization, Congress and the Securities and Exchange Commission addressed the crisis using the 1970s-era technologies of depository institutions, jumbo paper certificates, and a centralized ledger. *See generally In re Appraisal of Dell Inc.* (*Dell Ownership*), 2015 WL 4313206, at *3–7 (Del. Ch. July 30, 2015).

It was an incomplete solution at the time. Since then, despite laudable and largely successful efforts by the incumbent intermediaries to keep the system working, the problems have grown. *See, e.g.*, *In re Appraisal of Dell Inc.*, 143 A.3d 20, 59 (Del. Ch. 2016) (holding that under current Delaware law, beneficial owners forfeited their appraisal rights by inadvertently voting in favor of the merger due to complexities created by depository system); *Dell Ownership*, 2015 WL 4313206, at *9–10 (holding that under current Delaware law, beneficial owners forfeited their appraisal rights due to

Confronting these insuperable difficulties, class counsel determined that a more efficient method for distributing the settlement consideration would be to use the same mechanism that DTC used to distribute the merger consideration. DTC advised class counsel that this process is feasible and requires payment of a base fee to DTC of $2,250, with the potential for additional consultation fees if difficulties arise. A.B. Data and class counsel have budgeted $10,000 for additional consultations.

To date, A.B. Data has incurred fees and expenses for settlement administration of $180,323.95. A.B. Data projects that shifting to the DTC distribution system will cost an additional $37,000, primarily due to the expense necessary to print and mail a supplemental notice.

## II.       LEGAL ANALYSIS

Class counsel seek leave to modify the settlement to replace the claims process with a *pro rata* distribution through DTC. I view their motion as a request to modify the plan of allocation for good cause shown.

---

administrative change in the name of the nominee on the share certificate necessitated by depository system).

Distributed ledger technology offers a potential technological solution by maintaining multiple, current copies of a single and comprehensive stock ownership ledger. The State of Delaware has announced its support for distributed ledger initiatives. *See* Marco A. Santori, *Governor Jack Markell Announces Delaware Blockchain Initiative*, global Delaware Blog (June 10, 2016), http://global.blogs. delaware.gov/2016/06/10/delaware-to-create-distributed-ledger-based-share-ownership-structure-as-part-of-blockchain-initiative/.

A plan of allocation must be reasonable. *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1137-38 (Del. 2008). A plan does not have to compensate all potential claimants equally. "A reasonable plan may consider the relative values of competing claims." *Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del. 2009). In my view, a court also can take into account the administrative difficulties involved in achieving a proposed plan of allocation, including the anticipated expenses. At the extreme, a plan could consume the bulk of the settlement proceeds on the administrative costs necessary to achieve a precise allocation. Tradeoffs are inevitable.

The original plan of allocation sought to allocate consideration among holders of Dole's shares in direct proportion to their holdings, as is appropriate in a case where the harm affected all shares equally. Although the original plan sought to produce a proportionate allocation, it would not in fact have achieved it. This is because the original plan allocated the net settlement proceeds across holders who submitted valid claims. If a holder did not submit a claim, or if a holder could not provide sufficient documentation to support a claim, then the holder would not receive its share. After the initial distribution, the original plan contemplated additional distributions to the holders who had submitted valid claims. Dkt. 750, ¶¶ 7-8. In a typical claims process, claims are made for fewer than the total number of shares in the class. When the remaining settlement consideration is allocated among those who made claims, those holders receive more than their proportionate share. As a practical matter, the original plan of distribution would not have achieved a *pro rata* allocation among all class members, only a *pro rata* allocation among class members who made claims. All else equal, a claims-based plan of allocation

10

disproportionately benefits large holders who have systems in place that make it efficient for them to submit claims with adequate documentation.

Because of short selling and the high volume of trading during the three days before the closing of the merger, the pattern in this case departed from the norm. Rather than receiving claims for fewer than the total number of shares in the class, A.B. Data received claims for many more. To reiterate, claims were made for 49,164,415 shares when the class only comprised 36,793,758 shares. By definition, claims for 12,370,657 shares are invalid, but it is impossible to determine which ones without a lengthy, arduous, cumbersome, and expensive process. Plus, it would require a degree of cooperation from DTC participants and e-filers far beyond what they have provided to date.

One solution would be to ignore the discrepancy, pretend as if the class comprised holders of 49,164,415 shares, and distribute the settlement consideration *pro rata* among those claimants. In my view, that would be unjust. It would result in 25% of the consideration going to holders who should not receive it. As a consequence, the true holders of shares would receive only 75% of the settlement consideration to which they were entitled.

In my view, a superior solution is to grant the motion and permit class counsel to distribute the settlement consideration to record holders, including Cede. Through Cede, the consideration will flow to DTC and the custodial banks and brokers who are DTC participants. Through them, it will flow to the client institutions who held shares through the DTC participants.

11

This outcome is consistent with Delaware law. A series of Delaware Supreme Court decisions have made clear that a Delaware corporation only is required to recognize its record holders and need not attempt to determine its beneficial holders.[2] This principle extends to settlements. *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1061 (Del. Ch. 2015) (holding that for a notice of settlement be legally sufficient, a corporation only need mail it to its record holders). The modified plan of allocation will result in the settlement consideration being distributed to Dole's record holders.

The modified plan of allocation also recognizes that the Delaware law claims that provided the principal basis for the settlement were property rights associated with the shares. As shares changed hands, these property rights traveled with the shares. *Id.* at 1045; *accord In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543, at *4 (Del. Ch. July 26, 2002); *In re Resorts Int'l S'holders Litig.*, 1988 WL 92749, at *10 (Del. Ch. Sept. 7, 1988). The record holders of the shares at the time of the closing of the merger therefore held the claims. *Activision*, 124 A.3d at 1049, 1051-52, 1056. The consideration logically should flow to the record holders as of the time of the merger.[3]

---

[2] *See Enstar Corp. v. Senouf*, 535 A.2d 1351, 1354 (Del. 1987); *Olivetti Underwood Corp. v. Jacques Coe & Co.*, 217 A.2d 683, 686 (Del. 1966); *Am. Hardware Corp. v. Savage Arms Corp.*, 136 A.2d 690, 692 (Del. 1957); *Salt Dome Oil Corp. v. Schenck*, 41 A.2d 583, 584–89 (Del. 1945).

[3] This statement does not imply that only record holders could assert the claims. Nearly seventy years ago, this court recognized the right of a beneficial owner to assert equitable claims. *See Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 112 (Del. Ch. 1948) (Seitz, V.C.).

Distributing the merger consideration through the record holders and DTC also makes sense because that is how the merger consideration was distributed. The settlement consideration can be viewed as incremental merger consideration that the class should have received. From that perspective, it should be distributed the same way. That outcome makes all the more sense because DTC has advised class counsel that it has an established procedure for distributing settlement payments for mergers that DTC has processed. Although the parties to the settlement could be relieved of their obligation to search out Dole's beneficial owners in any event, the existence of the DTC procedure underscores the viability of this approach. It is also cost-effective. DTC will charge $2,250 for implementing the procedure. Even including an allowance of $10,000 for consultations with DTC, the expense profile compares favorably with further efforts to resolve the ownership discrepancies through a claims process.

Under this method, it will be up to the DTC participants and their client institutions to resolve in the first instance any issues over who should receive the settlement consideration. Shifting the burden to them is efficient because they already had to address these issues for purposes of allocating the merger consideration. If new issues arise, the DTC participants and their client institutions have access to their own records, and they have visibility into the terms of their contractual relationships, such as the terms on which shares are borrowed. Any ensuing disputes are between the beneficial owners and their custodial banks and brokers. *See Digex*, 2002 WL 749184, at *3. Those disputes should be resolved pursuant to the contractual mechanisms in the governing agreements or, if

13

necessary, through a judicial proceeding limited to the parties. Addressing those disputes is not part of the settlement process and therefore not a task for A.B. Data or this court.[4]

It is possible that this process could result in incremental costs for beneficial owners. A custodial bank or broker could err in processing the settlement consideration and the beneficial owner might not find out. Or a beneficial owner might have to sue its custodial bank or broker. These are risks inherent in choosing to hold in street name, and Delaware law leaves those risks with the beneficial owner who made that choice. *See, e.g.*, *Enstar*, 535 A.2d at 1354. Notably, the level of ownership at which these issues would arise is a truly voluntary level of ownership between the custodial banks and brokers and their clients. There is nothing inequitable in forcing the beneficial owner to bear the consequences of its voluntary choice to hold shares through a particular institution.[5]

---

[4] To a degree, the settlement stipulation already contemplates this result. It defines the term "Custodians" as "a broker dealer, bank, sub-custodian, or other nominee that holds securities in its name on behalf of a beneficial owner." Dkt. 750, ¶ 1(h). It provides that "[f]or settlement funds distributed by a Custodian, the Custodian shall follow its respective policies with respect to further attempted distribution or escheatment." *Id.*, ¶ 8(a). But it also contemplates that if a Custodian returns funds, the Settlement Administrator shall use its best efforts to locate the ultimate beneficial holder and re-attempt distribution. *Id.*, ¶ 8(b). Under the modified plan of distribution, the Settlement Administrator need not make any efforts beyond identifying the record holder. If a Custodian errs and returns funds incorrectly, then the client may have a remedy against the Custodian, but the Settlement Administrator will have done all that it is obligated to do.

[5] By contrast, the depository level of ownership is not voluntary; it resulted from a federal mandate. I have therefore posited that Delaware law should take into account the depository level of ownership by treating DTC participants as record holders for purposes of Delaware law, just as they are for purposes of federal law, and just as they were before the federal mandate. *See Dell Ownership*, 2015 WL 4313206, at *11-25 (recommending that Delaware law should take into account the federally imposed level of depository ownership by treating DTC participants as stockholders of record under the appraisal

14

One potential problem is that under this method, consideration could flow to holders of shares that are excluded from the class under the terms of the settlement, such as shares for which appraisal was sought or those held by certain defendants. Class counsel, A.B. Data, and DTC have undertaken to ensure that none of the settlement fund is paid to excluded holders. DTC has indicated that it can tailor the distribution to bypass the excluded holders if provided with the names of the account holders, the account numbers, the custodial banks or brokers, and the number of shares held in each account. The parties shall provide this information to DTC to the extent the information is within their possession, custody, or control.

Because this ruling changes the plan of allocation, notice will be distributed to the class. Class counsel has prepared a form of notice, which is approved as to form. A.B. Data will mail a copy of the notice to any holder that was sent a notice packet and a proof of claim, regardless of whether or not they submitted a claim or whether their claim was valid.

## III. CONCLUSION

Class counsel has established good cause to modify the plan of allocation. The settlement consideration will be distributed to record holders, including Cede, and flow through DTC. A detailed form of order implementing this ruling will be entered.

---

statute); *Kurz v. Holbrook*, 989 A.2d 140, 165-75 (Del. Ch. 2010) (holding that DTC participants were stockholders of record for purposes of stock list, obviating need for DTC omnibus proxy), *rev'd in pertinent part sub nom.*, *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 398 (Del. 2010) (deeming holding to be "*obiter dictum*" and "without precedential effect").

15

It bears noting for future merger cases that the problems raised by short sales and trades during the three days before closing appear endemic to the depository system and hence likely infect every claims process. Nothing about either factor was unique to Dole. The only difference was the magnitude of the discrepancy, which made the issues visible. Distributing the settlement consideration in merger cases to record holders from the outset would mitigate both pathologies and reduce overall administrative expenses, which in turn will benefit the class.